**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GRANT HEILMAN PHOTOGRAPHY INC.,<br><br>     Plaintiff,<br><br>v.<br><br>JOHN WILEY & SONS, INC.,<br><br>     Defendant. | Case No. 11-cv-01665-JKG |

**DEFENDANT JOHN WILEY & SONS, INC.'S MEMORANDUM OF LAW IN
<u>OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

Robert Penchina
LEVINE SULLIVAN KOCH & SCHULZ, LLP
321 West 44th Street, Suite 1000
New York, NY  10036
(T): (212) 850-6100
(F): (212) 850-6299
rpenchina@lskslaw.com


Joseph J. Barker
JOHN WILEY & SONS, INC.
111 River Street
Hoboken, NJ 07030
jobarker@wiley.com

*Attorneys for Defendant John Wiley & Sons, Inc.*

{

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ...................................................................................................1

FACTS ....................................................................................................................2

ARGUMENT ..........................................................................................................6

I.      ALL OF GHPI'S CLAIMS ARE BARRED BY THE STATUTE OF
        LIMITATIONS ..........................................................................................6

        A.      GHPI Knew or Had Reason to Suspect the Basis for Its Claims.............7

                1.      GHPI's Direct Receipt of Storm Warnings .................................7

                2.      GHPI's Imputed Knowledge of the Basis for Its Claims............9

        B.      GHPI Exercised No Diligence ...........................................................11

II.     GHPI'S INFRINGEMENT CLAIMS ARE CONTRACTUALLY BARRED ................13

III.    GHPI LACKS STANDING FOR 50 OF ITS CLAIMS...................................14

        A.      GHPI's "Assignment" Agreements Do Not Give It Standing
                With Respect to the Freelancer's Photos ................................14

        B.      GHPI's Post-Litigation Agreements Do Not Give It
                Standing For Grant Heilman's or Larry Lefever's Photos....................18

        C.      GHPI's Agency Agreements Do Not Give It Standing For Any Photos...............19

IV.     CERTAIN OF THE COPYRIGHT REGISTRATIONS RELIED
        ON BY GHPI ARE INVALID ....................................................................21

        A.      GHPI's Registrations For Grant Heilman's Photos Are Invalid..........................22

        B.      Some of GHPI's Work For Hire Registrations Are Invalid..................................23

V.      WILEY DID NOT EXCEED THE SCOPE OF CERTAIN PLEADED LICENSES .......24

CONCLUSION....................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,
    944 F.2d 971 (2d Cir. 1991)................................................................14, 17

*Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*,
    770 F.3d 610 (7th Cir. 2014) ..............................................................6

*Cmty. for Creative Non-Violence v. Reid*,
    490 U.S. 730 (1989)............................................................................23

*DRK Photo v. McGraw-Hill Cos.*,
    2014 WL 2584811 (D. Ariz. 2014)....................................................14, 20

*Eden Toys, Inc. v. Floralee Undergarments Co.*,
    697 F.2d 27 (2d Cir. 1982).................................................................14

*Gaia Techs., Inc. v. Reconversion Techs., Inc.*,
    93 F.3d 774 (Fed. Cir. 1996)..............................................................18

*Garcia v. I.N.S.*,
    222 F.3d 1208 (9th Cir. 2000) ...........................................................10

*Grant Heilman Photography, Inc. v. McGraw-Hill Global Educ. Holdings, LLC*,
    2015 WL 1279502 (E.D. Pa. 2015) ...................................................6, 7

*Grant Heilman Photography, Inc. v. McGraw-Hill Cos., Inc.*,
    2014 WL 3858186 (E.D. Pa. 2014) ...................................................21

*Immunocept, LLC v. Fulbright & Jaworski, LLP*,
    504 F.3d 1281 (Fed. Cir. 2007)..........................................................10

*John Wiley & Sons, Inc. v. DRK Photo*,
    998 F. Supp. 2d 262 (S.D.N.Y. 2014).................................................15, 21

*John Wiley & Sons, Inc. v. DRK Photo*,
    No. 11-cv-5454, slip op. (S.D.N.Y. Mar. 5, 2015) ................................21

*In re Kensington Int'l Ltd.*,
    368 F.3d 289 (3d Cir. 2004)...............................................................10

*L.A. Printex Indus., Inc. v. Le Chateau, Inc.*,
    2012 WL 987590 (S.D.N.Y. 2012)....................................................21

*Lexmark International, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1327 (2014) .................................................................................21

*Link v. Wabash R.R. Co.*,
    370 U.S. 626 (1962) ...................................................................................10

*Lorentz v. Sunshine Health Prods., Inc.*,
    2010 WL 3733986 (S.D. Fla. 2010) ...........................................................18

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ...................................................................................18

*Minden Pictures, Inc. v. John Wiley & Sons, Inc.*,
    2013 WL 1995208 (N.D. Cal. 2013) ....................................................15, 18

*Minden Pictures, Inc. v. John Wiley & Sons, Inc.*,
    10 F. Supp. 3d 1117 (N.D. Cal. 2014) .......................................................19

*Minden Pictures, Inc. v. John Wiley & Sons, Inc.*,
    2014 WL 295854 (N.D. Cal. 2014) ...........................................................15

*Minden Pictures, Inc. v. Pearson Educ., Inc.*,
    929 F. Supp. 2d 962 (N.D. Cal. 2013) ..................................................14, 15

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
    134 S. Ct. 1962 (2014) .................................................................................6

*Premier Tracks v. Fox Broad. Co.*,
    No. 12-cv-01615 DMG, Dkt. No. 41 (C.D. Cal. Dec. 18, 2012)................20

*Professional LED Lighting, Ltd. v. Aadyn Tech., LLC*,
    2015 WL 687416 (S.D. Fla. 2015) .......................................................18, 19

*Righthaven LLC v. Hoehn*,
    716 F.3d 1166 (9th Cir. 2013) ....................................................................14

*Schlier v. Rice*,
    630 F. Supp. 2d 458 (M.D. Pa. 2007) ........................................................10

*Silvers v. Sony Pictures Entm't, Inc.*,
    402 F.3d 881 (9th Cir. 2005) ......................................................................14

*Veal v. Geraci*,
    23 F.3d 722 (2d Cir. 1994)........................................................................9, 10

*Viesti Assocs., Inc. v. McGraw-Hill Global Educ. Holdings., Inc.*,
    2015 WL 585806 (D. Colo. 2015) ...................................................14, 15, 20, 21

*Viesti Assocs., Inc. v. Pearson Educ., Inc.*,
    2014 WL 1053772 (D. Colo. 2014)......................................................................14, 15, 19, 21

*Viesti Assocs., Inc. v. Pearson Educ., Inc.*,
    2014 WL 1055975 (D. Colo. 2014).......................................................................................15

*Visuals Unlimited, Inc. v. John Wiley & Sons, Inc.*,
    No. 11 143 Y 00658 13, Case Order No. 5 (AAA 2013) ....................................................2, 15

*William A. Graham Co. v. Haughey*,
    568 F.3d 425 (3d Cir. 2009).................................................................................................6, 7

*Wu v. Pearson Education, Inc.*,
    2010 WL 3791676 (S.D.N.Y. 2010)......................................................................................13

**Statutes**

17 U.S.C.
    § 101...............................................................................................................................23
    § 410..........................................................................................................................21, 22
    § 501(b).......................................................................................................................14, 21
    § 507(b)............................................................................................................................6

iv

John Wiley & Sons, Inc. ("Wiley") respectfully submits this memorandum in opposition to Grant Heilman Photography, Inc.'s ("GHPI") motion for partial summary judgment.

## <u>INTRODUCTION</u>

Wiley is a 208 year old publisher of textbooks and other materials.  For decades, GHPI licensed stock photos (*i.e.*, photos of ordinary and commonplace items, readily fungible with other photographs) to Wiley for inclusion in certain Wiley textbooks.  Those textbooks typically ran more than 700 pages, and GHPI photos comprised just a handful of the thousands of photos and other images in those books.   GHPI's license fee for those uses ran less than $210.

Although in the business of licensing photos, GHPI also seems to be in the litigation business. In addition to suing Wiley, GHPI brought copyright infringement cases against other of its textbook-publisher customers, such as McGraw-Hill, Houghton Mifflin, and Pearson.  Sonia Wasco, the owner and president of GHPI, has been paid multiple times to act as an expert witness.  She even met with other photo licensors, told them about claims being made against textbook publishers, and suggested that they get in touch with GHPI's contingency-fee lawyers to get in on the action.

GHPI makes much of its assertion that Wiley "has been sued for copyright infringement arising out of similar facts in at least 26 separate cases." GHPI Mem. (Doc. 192) at 2.  Most of these cases involved cookie-cutter complaints filed by GHPI's same contingency-fee lawyers.  GHPI failed to mention that in the vast majority of those cases there has been no judgments of liability against Wiley. Thus, while GHPI highlights cases like *Psihoyos v. John Wiley & Sons, Inc.*, where Wiley was found liable for infringement in just four of the eight instances of infringement pleaded in that case, it fails to mention cases like *Visuals Unlimited v. John Wiley & Sons, Inc.*, or *John Wiley & Sons, Inc. v. DRK Photo*, or *Minden v. John Wiley & Sons, Inc.*, in which the court or arbitrator rejected claims against Wiley for more than 2,400, 290 and 225 respective claimed instances infringement.

1

In this case, GHPI claims that Wiley committed nearly 300 instances of infringement dating back to the 1990s by allegedly using GHPI's photos beyond the scope of the licenses it granted to Wiley. GHPI moves for partial summary judgment just with respect to 72 instances. Thus, there will be a trial even if GHPI is completely successful. But, none of these 72 claims can succeed.

GHPI's claims are barred by the three-year statute of limitations applicable to copyright infringement actions. Moreover, 44 of GHPI's claims are contractually barred by GHPI's agreement—contained in the licenses drafted by GHPI itself—to forego its right to sue for copyright infringement. Many of GHPI's claims also must fail because, contrary to the conclusory assertions in GHPI's motion papers, (i) the copyright registrations upon which GHPI asserts 37 claims are not valid, and (ii) GHPI lacks standing to assert 51 claims here, as those claims belong only to the photographers—who did not part with their ownership of the copyrights in their photos. And, the record demonstrates that some of the supposedly excess uses made by Wiley were actually within the limits of the parties' agreements. For the Court's convenience, a chart identifying which specific defenses are applicable to each of GHPI's claims is provided as Exhibit DD to the Declaration of Robert Penchina.

## **FACTS**

GHPI is a stock photography agency that licenses photos for use by others on a nonexclusive basis. Penchina Dec. Ex. A at 46. The photos in GHPI's collection were, for the most part, created by photographers who were *not* employees of GHPI. *Id*. at 64-65. Rather, these photographers were independent contractors who owned the copyrights in their own photos, and they appointed GHPI to act as their agent with respect to the licensing of those photos to others. Wasco Dec. (Doc. 193) Ex. C; *see* Penchina Dec. Ex. A at 71-72.

The agency agreements GHPI entered into with photographers contain *no* provisions assigning copyright ownership to GHPI. Wasco Dec. Ex. C; Penchina Dec. Ex. L at 629-32. Nor did these

agreements permit GHPI to register any copyrights on behalf of the copyright owners.  Penchina Dec.

Ex. L at 632.  Rather, the agreements merely permitted GHPI to act as the copyright owner's <u>agent</u>

with respect to licensing the photos to others <u>on behalf of the photographers</u>. Wasco Dec. Ex. C;

Penchina Dec. Ex. L at 631.

 Among the independent contractor photographers who entered into agency agreements with

GHPI were James Strawser, Christi Carter, Alan Pitcairn, and Terry Brandt (collectively, the

"Freelancers"), whose photos are the subject of some of GHPI's claims in this case.[1]  Other GHPI

photographers, including GHPI's founder Grant Heilman and former part-owner of GHPI Larry

Lefever, had for a short time been employees of GHPI, but mostly contributed photos to GHPI's

collection as independent contractors just like the Freelancers.  Penchina Dec. Ex. A at 72-73, 75, 101.

Messers. Heilman and Lefever owned the copyrights in the photos they created as independent

contractors.[2]  Penchina Dec. Ex. A at 75-76, Ex. E at 44, 52.

 Since the mid-1990s, GHPI licensed photos for inclusion in Wiley textbooks.  Wasco Dec. ¶¶

14-15.  For each transaction, Wiley submitted a letter to GHPI to identify which photos from GHPI's

stock Wiley desired to use, which textbook the photographs would be included in, and what the

estimated print-run would be.  Compl. Ex. C.  Thereafter, GHPI issued an invoice to Wiley.  Wasco

Dec. Ex. E.

 Generally, the prices GHPI charged to license photos were established by GHPI pricing guides.

Penchina Dec. Ex. Y, Ex. A at 126-128, 134-37.  The guides, as well as industry standards, established

---

[1] The specific photos for which GHPI seeks summary judgment (and the photographers who created those photos, among other information) are identified in the chart that is Exhibit 1 to the Declaration of Amanda Bruss ("Bruss Dec.") (Doc. 192-2) that was submitted by GHPI in support of its motion; (this chart is referred to herein as "Bruss Ex. 1").  Photos created by the Freelancers are set forth on the following numbered lines of Bruss Ex. 1: James Strawser, lines 12, 23, 34, 47; Christi Carter, lines 22, 30, 32, 45; Alan Pitcairn, lines 55, 58; and Terry Brandt, lines 57, 61.

[2] The independently created Heilman and Lefever photos for which GHPI seeks summary judgment are identified in the following lines of Bruss Ex. 1: Grant Heilman, 2, 4, 6, 7, 9, 11, 14, 15, 18, 19, 20, 21, 24, 26, 29, 31, 35-40, 42, 43, 49-54, 64, 67-69, 71; and Larry Lefever, 16, 44, 48.

other terms applicable to the parties' transactions.  For instance, the "base price" charged to Wiley for distribution in the United States gave Wiley the right to distribute up to 5% of the licensed print run to Canada.  *Id*. Ex. A at 128.  Similarly, the base price for North American distribution permitted distribution of up to 10% worldwide without incurring an additional charge.  *Id*. Ex. J at 84; Ex. Q at 40-41.

GHPI charged Wiley $175 for the right to print *up to* 40,000 copies of a book, and GHPI charged $210--an additional $35--to print up to 100,000 copies.  *Id*. Ex. Y; Ex. D at 29-32.  Given the minute increase in fees, and that the price GHPI would have charged Wiley for making 40,000 copies would have been the same had Wiley requested to make just 100 copies, the estimated print run supplied by Wiley and incorporated into GHPI's invoices was simply _not_ a material term.[3]

Because no, or a *de minimis*, amount of money was at stake when a print run limit was exceeded, for decades GHPI made no efforts to determine if Wiley had exceeded any license limitations. *Id*. Ex. D at 21.  Indeed, GHPI had a contractual right to demand certified statements from Wiley setting forth "the total number of sales, subcontracts, adaptations, translations, and any other uses" of GHPI's photos, but GHPI *never* asked for such a statement.  *Id*. Ex. C at  198-200, 251-52.

In February 2006, GHPI's current attorneys called Sonia Wasco "out of the blue."  *Id*. Ex. A at 19-23; Ex. P at 42; Ex. K at 385-92; Ex. I at 176-78.  They informed her of opportunities for GHPI to make money by suing publishers for copyright infringement because those attorneys already knew of textbooks exceeding press run limitations.  *Id*. Ex. A at 19-23; Ex. P at 42; Ex. K at 385-92; Ex. I at

---

[3] Sonia Wasco now declares that because Wiley allegedly intentionally understated the size of the print runs it intended to make, "GHPI was damaged because it was not able to charge a fair price for the licenses."  Wasco Dec. ¶ 19.  But, GHPI's testimony confirms that if Wiley "told you that [it] wanted to print 50,000 but [it] really intended to print a hundred thousand" GHPI would ***not*** be giving Wiley a lower price.  Penchina Dec. Ex. D at 30; *see id.* at 31 ("if you asked for 50,000 [copies], yes, the price would have been up to a hundred thousand [copies]," and if Wiley requested "50 or a hundred thousand," either way GHPI would have charged "[t]he same price."); *id.* Ex. C at 245-46 ("[If] I had requested North American rights . . . for up to 30,000 copies, what price would I have been charged? A. $175. Q. And if I asked for a print run up to 40,000? A. $175.").

168.  GHPI continued the conversation and, in March 2007, signed up with those attorneys.  *Id*. Ex A at 19-23; Ex. I at 169-70.

GHPI began initiating cases, one at a time, against textbook publishers Houghton Mifflin, Pearson, McGraw-Hill and Wiley.  Ms. Wasco also assisted her attorneys with claims made by other stock photo agencies by agreeing to act as an expert.  In the past few years, Ms. Wasco testified as an expert in four cases similar to this one.  *Id*. Ex. G at 74.  She also went so far as to call other stock photos licensors to tell them about publishers exceeding press run limits, and she implored them to contact her own lawyers.  *Id*. Ex. R at 28 ("Sonia [told him] that there were a lot of infringements happening, and that he should take a meeting with Maurice Harmon.").  She also wrote photographers, telling them about alleged infringements, and she quoted to them from her lawyers' website that "Harmon & Seidman LLC is a national law firm representing photographers, artists, and writers" and it "specialize[s] in copyright infringement claims."  *Id*. Ex. U.

GHPI knew that to pursue seemingly lucrative infringement actions, copyrights for its photos would have to be registered.  GHPI also knew that its existing photographer agency agreements did not give it either the right to register copyrights or ownership of copyrights.  *Id*. Ex. L at 632.  So, GHPI tried to pursue infringement actions without standing or copyright registrations by spearheading a class action against Houghton Mifflin in April 2008.  *Id*. Ex. U.  In Ms. Wasco's own words, "[h]aving the unregistered images included in the case was our chief goal for filing a class action case."  *Id*.

After "the judge ruled that all of the images that did not have federally registered copyright were not able to be included in the case," GHPI scrambled to register copyrights.  *Id.*  GHPI asked photographers to sign a form pursuant to which the photographer "grants to [GHPI] legal title in the Images ***solely*** *for the purposes of* ***copyright registration***."  Wasco Dec. Ex. A at 2, 5, 8, 10 (emphasis added).  Ultimately  realizing that this form did *not* give it standing, GHPI asked its photographers to sign a second form.  Penchina Dec. Ex. A at 77-78; Ex. L at 635-36.  The second form merely purported to grant GHPI an impermissible bare right to sue for infringement.  It recited that the

5

photographer was "the _sole_ owner of the copyrights in the undersigned's Images," and "grants to [GHPI] legal title in the images _**for the purposes of litigation**_ of all copyright and related claims based on unauthorized use of the Images." Wasco Dec. Ex. A at 3, 4, 7, 9, 11.  And, GHPI did not keep anything but "agree[d] to reassign said legal title to the Images back to the undersigned [photographer] upon the conclusion of _any_ such litigation." _Id_.

## ARGUMENT

## I.   ALL OF GHPI'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

The Copyright Act imposes a three-year statute of limitations on suits for copyright infringement. 17 U.S.C. § 507(b). GHPI filed this case on March 8, 2011.  It claims infringements occurred as long ago as 1997. GHPI  has presented <u>no</u> evidence of any infringing act occurring within the three years before it filed suit—_i.e._, after March 8, 2008.  Thus, GHPI's claims are barred unless GHPI can show that the running of the statute of limitations somehow was tolled.  GHPI cannot make this showing at all, much less as a matter of law.

The Third Circuit has adopted the "discovery rule" for copyright infringement actions, under which "the running of the statute of limitations is tolled until 'the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim.'" _Grant Heilman Photography, Inc. v. McGraw-Hill Global Educ. Holdings, LLC_, 2015 WL 1279502, *10 (E.D. Pa. 2015) (quoting _William A. Graham Co. v. Haughey_, 568 F.3d 425, 438 (3d Cir. 2009) ("_Graham I_")).[4] The test for whether tolling applies involves two considerations. _Id_. at *11. First,  the "court should

---

[4] The recent Supreme Court decision in _Petrella v. Metro-Goldwyn-Mayer, Inc._, 134 S. Ct. 1962 (2014) raises questions about the viability of the "discovery rule" for copyright infringement claims. _See  Chicago Bldg. Design, P.C. v. Mongolian House, Inc._, 770 F.3d 610, 616 (7th Cir. 2014) ("[I]n light of _Petrella_, we now know that the right question to ask in copyright cases is whether the complaint contains allegations of infringing acts that occurred within the three-year look-back period from the date on which the suit was filed."). The Third Circuit has not revisited the issue since _Petrella_.  Because the copyright statute does not explicitly adopt a discovery rule, the statute of limitations for infringement claims should be governed by the "injury rule"—_i.e.,_ a claim accrues at the time the infringement occurred rather than when the plaintiff learned that it occurred. Whichever rule applies, GHPI's claims are barred on the present record.

examine whether a plaintiff 'should have known the basis for [its] claims[, which] depends on whether [it] had sufficient information of possible wrongdoing to place [it] on inquiry notice or to excite storm warnings of culpable activity.'"  *Id*. (citation omitted).  Then, the plaintiff must "'show that [it] exercised reasonable due diligence and yet [was] unable to discover [its] injuries.'"  *Id*. (citation omitted).  Here, GHPI was well aware of the basis for its claim against Wiley.  The only way it could not have been was to close its eyes and exercise absolutely no diligence in the face of severe storm warnings.

### A.    GHPI Knew or Had Reason to Suspect the Basis for Its Claims

#### 1.    GHPI's Direct Receipt of Storm Warnings

Sonia Wasco was aware well before March 8, 2008 that Wiley may have exceeded print run limitations or otherwise violated GHPI's rights.

In February 2006, GHPI's attorney phoned her to talk about "copyright infringements" in "textbook cases."  Penchina Dec. Ex. O at 65-66; *see id*. Ex. A at 20; Ex. K at 390-92.  Although not GHPI's attorney yet, he called to say that he was representing a photographer in a copyright infringement case against Houghton Mifflin, "and he noticed that we [GHPI] had images in the same book."  *Id*. Ex. A at 20-21.  In further conversations, the attorney told her about specific print overruns, and, by March 2007, GHPI retained the attorney.  *Id*. Ex. H at 169; Ex A at 19.  Soon after, "in the summer of 2007," GHPI obtained information that demonstrated to GHPI that "Houghton Mifflin is using [GHPI's] images in excess of the amount or manner licensed."  *Id*. Ex. P at 40.

Upon learning about Houghton Mifflin's violations, GHPI immediately became suspicious of its other textbook publisher customers, including Wiley.  "It was something that we [GHPI] thought we needed to take a look at to see if it was being repeated anywhere else."  *Id*. Ex. D at 23; *see id*. Ex. J at 40-41 ("when the company found out about Houghton Mifflin" GHPI "became more curious if other publishers were doing the same thing.").  As the GHPI office manager responsible for issuing licenses to Wiley, testified in another case: once GHPI knew for sure that a publisher was violating its licenses,

it "kind of *put up a red flag*" and GHPI became "*more aware*" in "regards to other publishers." *Id.* Ex. J at 78-79 (emphasis added). As soon GHPI "took a closer look" at other publishers, it found "[p]rint overruns" and other violations. *Id.* Ex. D at 24.

GHPI attempts to avoid the statute of limitations by falsely stating in a declaration that, even in 2009, when "GHPI issued [certain] retroactive licenses [to Wiley for having exceeded a print run], we believed these to be isolated incidents, . . . in no way indicative of a widespread practice by Wiley of exceeding license terms." Wasco Dec. ¶ 26. Contrary to this revisionist history, Ms. Wasco testified that by 2008, GHPI and its attorneys "*were already discussing lawsuits with other publishers*"—specifically, GHPI was "*discussing suits against Pearson and Wiley*." Penchina Dec. Ex. I at 176-77 (emphasis added). Indeed, "[a]t this time [in 2008], we [GHPI] were putting together our documents for Pearson and **Wiley**. We were working on [lawsuits against] Pearson and **Wiley**." *Id.* at 177 (emphasis added).

In fact, GHPI had become aware of potential violations by Wiley long before. In 2005, Carroll Forry emailed Wiley about a photo Wiley had used in *Environment* by Raven, 5e, without a license from GHPI. *Id.* Ex. AA.

The information about violations that reached GHPI from 2005 to 2007 did not come as a surprise. Ms. Wasco long knew about textbook industry print overruns. Ms. Wasco is exceptionally knowledgeable and up to date about developments in the stock photo industry—including legal developments and the pendency of infringement claims against textbook publishers. Ms. Wasco is former president of the PACA (Picture Archive Council of America), "the Trade Association in North America for people who license images," and she remains active in the organization. *Id.* Ex A at 29; Ex. O at 38-39, Ex. H at 176. PACA "hold[s] seminars on issues relating to copyright pretty frequently," and "the subject of textbook industry print overruns" has been discussed. *Id.* Ex. A at 31-32. Ms. Wasco constantly communicates with other PACA members; they "call each other all the time." *Id.* Ex. O at 38-39. She routinely discussed textbook overruns with Robert Folz (of Visuals

8

Unlimited), Larry Minden, and Phillip Degginger, each of whom ultimately brought their own cases against Wiley (none of which resulted in a finding of liability against Wiley). *Id*. Ex. A at 37-39; Ex. R.

GHPI also learned about the print overruns from Jim Pickerell--a "journalist in the photo industry" whom GHPI initially designated as its expert in this case—who regularly wrote about textbook print overruns. *Id*. Ex. A at 122. Ms. Wasco not only reads Pickerell's reports—she was his source. He testified that Ms. Wasco "is usually one of the sources I go to when I have questions or are looking for information about what's going on in the textbook industry." *Id*. Ex. Q at 31-32.

In 1999, Mr. Pickerell wrote about textbook print overruns and advised licensors like GHPI that they can "no longer trust" textbook publishers—"maybe any publisher." *Id*. Ex. BB. In 2002, Mr. Pickerell reported that "[p]hotographers who had images published in the John Wyley [sic] book *Science Directions 7* . . . have recently discovered that the book was re-published in Australia in 1993 and none of the photographers were paid for this Australian usage. *Id*. Ex. X at 2. Ms. Wasco's testimony confirms that she was alerted to violations by reading a Pickerell report "alerting people to a publication . . . that was out without permission." *Id.* Ex. A at 121-22. Throughout the 2000's, Mr. Pickerell "tried to get the word out" to stock photo licensors that they can "no longer trust the publishers to abide by the agreements that they had made." *Id*. Ex. Q at 75-76. At the same time, PACA—Ms. Wasco's association—also was trying to "get that same word out." *Id.* It is inconceivable that the word did not reach GHPI.

## 2. GHPI's Imputed Knowledge of the Basis for Its Claims

In addition to GHPI's direct receipt of storm warnings, its lawyer's knowledge of grounds for claims against Wiley is imputed to GHPI.

"[W]hen an agent is employed to represent a principal with respect to a given matter and acquires knowledge material to that representation, for purposes of assessing the principal's rights and liabilities vis-à-vis a third person the agent's knowledge is imputed to the principal." *Veal v. Geraci*,

23 F.3d 722, 725 (2d Cir. 1994).  "The relationship between an attorney and the client he or she represents in a lawsuit is one of agent and principal."  *Id*.  Thus, "[a] party, of course, is charged with the knowledge of its counsel."  *In re Kensington Int'l Ltd.*, 368 F.3d 289, 329 (3d Cir. 2004); *see, e.g., Garcia v. I.N.S.*, 222 F.3d 1208, 1209 (9th Cir. 2000) (holding that "[i]t is a longstanding principle that in 'our system of representative litigation . . . each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.'" (quoting *Link v. Wabash R.R. Co*., 370 U.S. 626, 634 (1962) (internal citation and quotation marks omitted)); *Schlier v. Rice*, 630 F. Supp. 2d 458, 470 (M.D. Pa. 2007) ("Miller's attorneys . . . had actual knowledge of the fact that Miller's subordinates were being accused of unconstitutional conduct, so Miller must be charged with the legal consequences of having actual knowledge of that fact.").

When analyzing whether a claim is barred by a statute of limitations under a discovery rule, courts routinely impute to plaintiffs the knowledge obtained by their attorneys.  For example, in *Veal*, the court analyzed application of the statute of limitations for a Section 1983 action, where a claim "accrues once the plaintiff knows or has reason to know of the injury which is the basis of his action." 23 F.3d at 724 (quotation marks and citations omitted).  There, the plaintiff Veal brought suit five years after he appeared in a police line-up, claiming he just learned that the line-up procedure was tainted.  Years before the suit, however, Veal's attorney attended a "hearing at which [a witness] disclosed the details of the events on which Veal now relies for his cause of action."  *Id*. at 725.  The court found that the "attorney's knowledge must be imputed to Veal," so "Veal had reason to know of the conduct giving rise to his present claim" and his claim was barred.  *Id.  See also, e.g.*, *Immunocept, LLC v. Fulbright & Jaworski, LLP*, 504 F.3d 1281 (Fed. Cir. 2007) (claim barred under discovery rule based on an attorney's knowledge that was imputed to the plaintiff).

The result should be no different here.  GHPI's attorneys were fully aware of the basis for GHPI's suit much more than three years before this case was filed.  In 2006 and 2007—after GHPI's attorneys called Ms. Wasco, and during the precise time period for which GHPI's attorneys have

10

invoked an attorney-client privilege for their communications with her (Penchina Dec. Ex. A at 19-21)—GHPI's attorneys specifically investigated how many copies of textbooks Wiley had printed. *Id.* Ex. S at 13-14; Ex. T ("I was hired in 2006, as a professional investigator, to audit publishers' uses of licensed images on behalf of photographers. During the audits I requested the actual print run numbers published by John Wiley & Sons, Inc. . . . .."). Among the books for which the investigator provided print run amounts in a report to Harmon & Seidman dated November 17, 2007 was *Introducing Physical Geography*, Second Edition, by Strahler, which is one of the same books for which GHPI now seeks summary judgment. *Id.*; *see* Bruss Ex. 1, lines 22 & 23.

Around the same time, GHPI's lawyers, acting on behalf of another photographer, sent a demand to Wiley indicating that that they were then already aware of Wiley exceeding print run limitations. Penchina Dec. Ex. V (claiming that *Introducing Physical Geography*, Third Edition, was "reproduced in print . . . at least 55,200 times" without authorization). This is another book for which GHPI now seeks summary judgment. Bruss Ex. 1, lines 45-47.

Imputing an attorneys' knowledge to a client is particularly appropriate here. Sonia Wasco was not merely a client of Harmon & Seidman, but part of their litigation machine. She collaborated with them as an expert, and drummed up others to join their crusade against textbook publishers. She also kept in touch with a network of their other clients to discuss status of their claims. Penchina Dec. Ex. C at 216-17. Her attorneys' knowledge was not obscure—she was in the center of the storm.

### B.    GHPI Exercised No Diligence

GHPI consciously avoided learning more specific information about Wiley's print overruns until after it got a head start on a bigger case. GHPI wants the Court to believe that "GHPI had no way of knowing the extent of Wiley's actual use of its photographs." GHPI Mem. at 2. That simply is false. As Ms. Wasco testified, GHPI "in fact did have a mechanism to find out how much usage there was." Penchina Dec. Ex. I at 71. Indeed, it had many methods to determine if its rights had been

violated—it just chose not to use them.  *Id.* ("A. The mechanism [to find out] was there. Q. Yes and you never employed it.  A. Correct.").

For example, GHPI's licenses to Wiley contained a provision stating that "In the event that any images are used by Recipient in publications, then Recipient shall send to GHP, on a semi-annual basis (June 30th and December 31th) a certified statement *setting forth the total number of sales . . . and any other uses*."  Wasco Dec. Ex. F at 6 (emphasis added).  Wiley did not provide these statements and GHPI never requested them.  Penchina Dec. Ex. C at 251-52; *see id.* 198-200.  Similarly, GHPI had a right to obtain copies of Wiley textbooks in which GHPI photos appeared.  Wasco Dec. Ex. F; Penchina Dec. Ex. D at 25; Ex. C at 218-19.  Although GHPI checked for and found violations by other publishers by obtaining "copies of textbooks that we could look through," GHPI never even asked Wiley for the books.  Penchina Dec. Ex. D at 24-26.

GHPI also had the means to check for violations by doing simple internet research.  *Id.* Ex. P at 39 ("we've seen on the Internet there are [another publisher's] international editions being done and sold in other countries").  GHPI concedes that after it filed suit it "would just do some checking on Amazon or Wiley's site" to check for compliance with its licenses.  *Id.* Ex. A at 174.  As long ago as 2000, Ms. Wasco counseled photo licensors to monitor the use of their work.  For example, she posted to an internet stock photo discussion: "For quite some time we have known www.google.com to be one of the best search engines to be found.  We continually find unlicensed uses of images by periodically searching this site."  *Id.* Ex. W.

GHPI always had the means to discover its alleged injuries.  It just never tried  *See, e.g., id.* Ex. C at 191-92 ( "Q. Did you at GHPI follow-up on permissions that previously had been granted to see if the permissions were complied with.  A. No."); *id.* ("Q. Did GHPI ever follow-up with textbook publishers to see whether the textbook publisher stayed within the parameters of a license? A. Not that I recall.").

## II.    GHPI'S INFRINGEMENT CLAIMS ARE CONTRACTUALLY BARRED

GHPI has failed to state a claim for copyright infringement because it has contractually forgone its right to bring suit for 44 of its claimed instances of infringement.  The contract provision barring GHPI's claims is contained in all of GHPI's invoices issued since November 16, 2000.  Wasco Dec. Ex. F (Doc. #194-5 p. 6).  The claims identified in lines 29 through 72 of Bruss Ex. 1 are governed by this provision.

As Ms. Wasco states in her declaration submitted in support of GHPI's motion:

> GHPI's terms and conditions clearly indicate GHPI's understanding:

> "In the event you utilize an image for any use other than that indicated on the invoice, including but not limited to the number of uses, the publication utilized, or the size of reproduction, **GHP agrees to forego its right to sue for copyright infringement** if you pay, as liquidated damages, a sum equal to ten (10) times the maximum price we would have charged for such use, within ten (10) days of our billing such fee. This is not a penalty but an agreed fair use charge. If you fail to make such payment in ten (10) days, we shall have the right to sue for copyright infringement and breach of contract."

Wasco Dec. ¶ 24 and Ex. F at 6 (emphasis added).  Although it did so in another instance (Wasco Dec. ¶ 26 and Ex. H at 6-8), *GHPI never billed Wiley for ten times* the usual or maximum price *for any of the uses at issue in this case*.  Penchina Dec. Ex. C at 197.  Thus, under the terms of the parties' agreements that were written and clearly understood by GHPI, agreed to forego its right to sue for copyright infringement.

In *Wu v. Pearson Education, Inc*., 2010 WL 3791676, *5 (S.D.N.Y. 2010), the plaintiff's invoice contained language nearly identical to GHPI's.  There, the court held that "Wu may not file a complaint until this condition precedent has been satisfied."  *Id*. at 6.  Because Wu had not issued the specified invoice, he failed to state a claim and the court dismissed his infringement claims.  *Id*.  The result should be no different here.

## III.  GHPI LACKS STANDING FOR 50 OF ITS CLAIMS[5]

GHPI's matter-of-fact assertions that it is "both the legal and beneficial owner of the Photographs," and "has standing," lack merit.  Other than GHPI's claim of authorship under the work for hire doctrine for some photos at issue, all of GHPI's standing arguments have *been rejected* time and time again when  raised in multiple cases by GHPI's same lawyers.

"The Copyright Act authorizes only two types of claimants to sue for copyright infringement: (1) owners of copyrights, and (2) persons who have been granted exclusive licenses by owners of copyrights." *Eden Toys, Inc. v. Floralee Undergarments Co.*, 697 F.2d 27, 32 (2d Cir. 1982); *see, e.g., Silvers v. Sony Pictures Entm't., Inc.*, 402 F.3d 881 (9th Cir. 2005); 17 U.S.C. § 501.  "[T]he Copyright Act does not permit copyright holders to choose third parties to bring suits on their behalf." *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991); *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1169-1170 (9th Cir. 2013).  Thus, "'[t]he bare assignment of an accrued cause of action is impermissible under [17 U.S.C. §] 501(b).'"  *Minden Pictures, Inc. v. Pearson Educ., Inc.*, 929 F. Supp. 2d 962, 968 (N.D. Cal. 2013) (quoting *Silvers*, 402 F.3d at 890).

### A.  GHPI's "Assignment" Agreements Do Not Give It Standing With Respect to the Freelancer's Photos

GHPI argues that its photographers "assigned their copyrights" to GHPI pursuant to two different "assignment" forms.  GHPI Mem. at 3.  Neither of these forms actually assigned any copyright to GHPI.

Multiple courts have held that similarly worded "assignment" forms – all drafted by GHPI's counsel – are incapable of providing standing.  *See Viesti Assocs., Inc. v. McGraw-Hill Global Educ. Holdings., Inc.*, 2015 WL 585806 (D. Colo. 2015); *DRK Photo v. McGraw-Hill Cos.*, 2014 WL 2584811 (D. Ariz. 2014); *Viesti Assocs., Inc. v. Pearson Educ., Inc.*, 2014 WL 1053772 (D. Colo.

---

[5] GHPI lacks standing for *all* of the claims listed in Bruss Ex. 1 *except* those in lines 1, 3, 5, 8, 10, 13, 17, 25, 27-28, 33, 41, 46, 56, 59-60, 62-63, 65-66, 70, and 72.

2014); *Viesti Assocs., Inc. v. Pearson Educ., Inc.*, 2014 WL 1055975 (D. Colo. 2014); *John Wiley & Sons, Inc. v. DRK Photo*, 998 F. Supp. 2d 262 (S.D.N.Y. 2014); *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 2014 WL 295854 (N.D. Cal. 2014); *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 2013 WL 1995208 (N.D. Cal. 2013); *Minden Pictures, Inc. v. Pearson Educ., Inc.*, 929 F. Supp. 2d 962 (N.D. Cal. 2013); *see also Visuals Unlimited, Inc. v. John Wiley & Sons, Inc.*, No. 11 143 Y 00658 13, Case Order No. 5 (AAA 2013). In each of these cases, stock photo agencies tried, like GHPI here, to give themselves standing by asking photographers to sign forms purporting to assign their copyrights and the right to sue.

The courts found that, notwithstanding that the forms recited that they were transferring "copyrights and complete legal title" to the photos, the assignments were shams whose "clear and unambiguous intent … was to assign to [plaintiff] the bare right to sue" and could not give the agencies standing. *DRK*, 998 F. Supp. 2d at 269, 281 (quotation marks and citation omitted). Among the factors the courts relied on to reject these form assignments was that "they 'are silent as to any compensation or royalties the photographer will receive for such an assignment,'" *Viesti Assoc.*, 2015 WL 585806, at *5 (citation omitted); they would terminate "upon conclusion of any litigation" (but "[i]f the parties genuinely intended to transfer []ownership, under the terms of the contract [the agent] would retain that []ownership in perpetuity"), *Minden*, 929 F. Supp. 2d at 969; and their purpose was to let the agencies "'bring suit and divvy up any return.'" *DRK*, 998 F. Supp. 2d at 281 (citation omitted).

GHPI's forms are less effective than those that were rejected. On their face, GHPI's forms do not even state that they are assigning copyright but only "legal title" to "Images." Wasco Dec. Ex. A. Moreover, while the courts analyzing the other forms had to infer that their true purpose was to contrive standing for litigation, GHPI's forms *expressly declare* that the assignments to it are only "*for the purpose of litigation*." *Id*. at 3, 4, 7, 9, 11 (emphasis added).

15

GHPI's first form merely "grants to Grant Heilman legal title in [the photographer's] Images *solely for the purpose of copyright registration*." *Id.* at 2, 5, 8, 10 (emphasis added).  Whatever this form granted was automatically "reassign[ed] . . . back to the undersigned [photographer] immediately upon completion of the registration." *Id.*; *see* Penchina Dec. Ex. A at 77 ("[we] asked them to sign an agreement . . . which transferred the copyright of their images to us for the purpose of copyright registration.  When the registration was complete the copyright transferred back to the photographer.").  GHPI's second form just "grants to Grant Heilman legal title in the Images *for the purposes of litigation* of all copyright and related claims based upon unauthorized of use of the Images." Wasco Dec. Ex. A at 3, 4, 7, 9, 11 (emphasis added).  Like with the first form, the second grant reverts to the photographers: "Grant Heilman agrees to reassign said legal title to the Images back to the undersigned immediately upon the conclusion of any such litigation." *Id.*  And with both forms, each photographer "transfers all of its right, title and interest, in any accrued or later accrued claim . . . brought to enforce the undersigned's copyright."

GHPI's forms did not memorialize *bona fide* transactions assigning rights to GHPI, but are shams simply intended to enhance GHPI's paper record for litigation.  The photographers received absolutely **no** consideration for their supposedly assigning their valuable copyrights.  Penchina Dec. Ex. P at 144 ("Q. And what does the photographer get in exchange for giving you that right or assigning to you that right? A. Nothing.").  Far from documenting an agreement to sell a copyright, GHPI just needed the assignment forms to make sure "every little gap is closed before we proceed" with filing suit.  *Id.* Ex. U; *see id.* (the imminence of GHPI's claim "puts urgency on your getting the signed copy back to us.").

Ms. Wasco testified that "[t]hese are assignments that -- our attorney first drew up the form letter, and we sent them to our photographers for signature and agreement so that we could register the copyright of their images and then represent their images in action in the courts." *Id.* Ex. G at 41.  The forms have nothing to do with granting any of the rights that comprise copyright—such as reproducing

or distributing the photos.  Rather, their purpose was to "appoint[] and permit[] Grant Heilman to prosecute said accrued or later accrued claims" and to apportion "[a]ny proceeds obtained by settlement or judgment for said claims."  Wasco Dec. Ex. A; *see* Penchina Dec. Ex. L at 636 ("[T]he purpose of both of these forms is to transfer ownership of the images from the photographer to Grant Heilman Photography *for the purpose of copyright registration and litigation*" (emphasis added)).  Thus, when Ms. Wasco transmitted the forms to photographers, she said that she needed them because GHPI was about to file a "case here in Pennsylvania on behalf of all the remaining images." Penchina Dec. Ex. U; *id*. Ex. A at 78 ("why did you ask photographers to sign that form in early 2008? A. "Those photographers that we asked to sign . . . had one or more images in the  . . . Houghton Mifflin Harcourt case.").

All of the parties to the assignment understood that the photographers—not GHPI—continued to own the copyrights.  *Id*. at 71-72. (Q. Do the commissioned photographers own their photos? A. Yes.  Q. Do they own the copyright in their photos? A. Yes."); *id*. Ex. P at 63  ("GHP is in the business of licensing images; correct?  A Correct.  Q And those images are photos . . . that have copyrights that are owned by photographers? A Yes.").  As Ms. Wasco confirmed, GHPI merely has "assignments with our photographers for the purpose of this litigation."  *Id*. at 144.  And, the photographers also understood that GHPI's form just "assigns GHPI the right to represent me in legal action."  *Id*. Ex. E at 62; Ex. F at 15 ("I don't fully understand [the form], but I was instructed and I agreed to sign it when the lawsuits were initiated.").  GHPI's assignments are nothing more than attempts to "choose third parties to bring suits on [the photographers'] behalf"—which "the Copyright Act does not permit." *ABKCO Music, Inc*., 944 F.2d at 980.  Therefore, GHPI's motion for summary judgment for the claims in Bruss Ex. 1 lines 12, 22, 23, 30, 32, 34, 45, 47, 55, 57, 58 and 61 should be denied.

**B.      GHPI's Post-Litigation Agreements Do Not Give It Standing For Grant Heilman's or Larry Lefever's Photos[6]**

Separately, on June 21, 2011, Grant Heilman—who had not signed either of the two assignment forms used by GHPI—signed a more sparsely worded "Copyright and Accrued Causes of Action Assignment" form purporting to assign his copyrights to GHPI.  Wasco Dec. Ex. A at 6.  Then, on August 3, 2011, GHPI entered into "stockholder's redemption" agreements with Mr. Heilman and Larry Lefever.  Wasco Dec. Ex. B.  Pursuant to these stockholder's agreements, Mr. Heilman and Mr. Lefever each sold to GHPI "images and photographs, and companion copyrights" in their photos that are part of GHPI's collection. None of these agreements provide standing to GHPI because they were entered into months *after* GHPI filed this suit.

"'If Plaintiff did not have the right to sue for accrued infringements at the time she filed [the] action, she lacks standing to maintain [the] action.'"  *Professional LED Lighting, Ltd. v. Aadyn Tech., LLC*, 2015 WL 687416, *11 (S.D. Fla. 2015) (quoting *Lorentz v. Sunshine Health Prods., Inc.*, 2010 WL 3733986, *84 (S.D. Fla. 2010)); *see, e.g.*, *Minden*, 2013 WL 1995208, *8 (N.D. Cal. 2013) ("Whether a plaintiff has standing to file suit is evaluated by looking to 'the facts as they exist when the complaint is filed.'" (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 571 n. 4 (1992)).  As one court explained,

> Permitting non-owners and licensees the right to sue, so long as they eventually obtain the rights they seek to have redressed, would enmesh the judiciary in abstract disputes, risk multiple litigation, and provide incentives for parties to obtain assignments in order to expand their arsenal and the scope of litigation.

*Gaia Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774, 780 (Fed. Cir. 1996).  Thus, assignments of copyright issued after the litigation commenced cannot provide standing in that litigation.  This is so even if the post-litigation writing is confirming an earlier oral transfer.  *Professional LED Lighting*,

---

[6] Claims for these photos are listed in the following lines of Bruss Ex. 1: 2, 4, 6, 7, 9, 11, 14-16, 18, 19, 20, 21, 24, 26, 29, 31, 35-40, 42- 44, 48-54, 64, 67-69, and 71.

2015 WL 3733986, *12 ("While a post-hoc memorialization of an oral assignment can satisfy the

section 204 note or memorandum requirement, that later memorialization must still predate the

litigation . . . in order to confer standing on the assignee."). Thus, GHPI's agreements in June and

August of 2011 provide no standing to GHPI for this action started in March 2011.

   C.   **GHPI's Agency Agreements Do Not Give It Standing For Any Photos**

   Between approximately 1988 and 1999, GHPI entered into agreements with most of the

photographers under which GHPI was appointed the photographers' agent for the "sale, license and

lease" of their photos. Wasco Dec. Ex. C. There is no such signed agreement with Freelancer Alan

Pitcairn. *See id.* Nothing in these agency agreements give GHPI standing to pursue any of claims in

this case. Indeed, there would have been no reason for GHPI to obtain assignments from the

photographers in 2008 if the agency agreements had already provided it with any exclusive rights.

   Contrary to GHPI's arguments, the agency agreements do not convey any copyright ownership

to GHPI. Here, as a court observed rejecting similar arguments by GHPI's lawyers about another

agency's agreements, the agreement's "only reference to ownership . . . clearly states that sole and

exclusive ownership in the images is vested with the photographer." *Viesti*, 2014 WL 1053772, *12;

*see* Wasco Dec. Ex. C ¶ 8.1 ("Photographer is and will be sole owner of all the Photographs and all of

the rights granted to [GHPI] in this Agreement"). GHPI's current assertion that the pre-1999 agency

agreements gave it an ownership interest in the photographers' copyrights also is belied by the decade

later forms that state that the photographer "is the *sole owner* of the copyrights in the undersigned's

[photographer's] images." Wasco Dec. Ex. A (emphasis added). *See Minden Pictures, Inc. v. John

Wiley & Sons, Inc.*, 10 F. Supp. 3d 1117, 1125 (N.D. Cal. 2014) ("The copyright assignments affirmed

that the photographers are the "sole owner of the copyrights"—an affirmation that belies any claim that

the photographers intended (or believed) that the prior agency agreements had already transferred a

coownership interest"). GHPI always knew that its agency agreements did not give it ownership of

19

copyright.  Penchina Dec. Ex. A at 71-72; Ex. P at 63 (the photos it licenses "have copyrights that are owned by photographers").

Moreover, GHPI's assertion that it "held at least three of the exclusive rights of copyright" by virtue of the agency agreements is just wrong.  GHPI Mem. at 3.  The agency agreements did not grant a license for GHPI to itself reproduce, distribute or publicly display the photos—*i.e.,* there is no provision in the agreement pursuant to which the photographers "hereby grant to GHPI an exclusive right" to reproduce, etc.  Rather, the agency agreement merely appoints GHPI as the photographer's "exclusive *agent* and *representative*" with respect to the licensing of the photos to others *on behalf of the photographer.*  Wasco Dec. Ex. C ¶ 4.1 (emphasis added).  This does not vest GHPI with any exclusive rights of copyright.  As one court explained in rejecting the identical argument: "'[t]he exclusive right to grant licenses for others to publicly perform or reproduce a work is separate and distinct from the exclusive right to publicly perform or reproduce a work itself,'" and thus "'*licensing agents are not legal owners of section 106 exclusive rights and do not have standing to sue for copyright infringement*.'"  *Minden*, 10 F. Supp. 3d at 1128 (quoting *Premier Tracks v. Fox Broad. Co.*, No. 12-cv-01615 DMG, Dkt. No. 41 (C.D. Cal. Dec. 18, 2012) at 8-9); *see, e.g., Viesti*, 2015 WL 585806, *6 ("these Agency Agreements merely appoint Viesti 'an exclusive agent and representative' and fail to transfer any exclusive licenses").

GHPI's assertion that the agency agreements make it a "beneficial owner" of the photographers' copyrights lacks any basis.  Courts define "'beneficial owner' as being only an individual who *had legal title* and parted with it in exchange for royalties."  *DRK*, 2014 WL 2584811 *6 (emphasis added).  "[L]icensing agents *are neither legal nor beneficial owners of a copyright*."  *Minden*, 10 F. Supp. 3d at 1127 (emphasis added) (citing cases).

GHPI argues it is a beneficial owner because it "is entitled to a share of the proceeds from licenses it sells."  GHPI Mem. at 9.  GHPI failed to inform the Court that its attorneys have advanced this argument many times and it was rejected in each and every instance.  As one court stated, the

argument that "even if it is not the legal owner of the copyrights at issue, it is the 'beneficial owner' because under the Representation Agreements, it is entitled to one-half of the proceeds under the licenses" is simply "unavailing," and "the cases on which [that plaintiff] relies [--*i.e.*, the same cases relied on by GHPI--] do not prove otherwise." *DRK*, 998 F. Supp. 2d at 279; *see, e.g.*, *Viesti*, 2014 WL 1053772, at *12 ("Because Viesti's economic interests are derived solely from its own [and its licensee's] use of the copyright and not from the use of the copyright by its legal owners, the photographers, Viesti is not a beneficial owner pursuant to § 501(b).").

GHPI's contention that the recent case *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1327 (2014), somehow extended standing to it is wrong.  GHPI Mem. at 10.  "*Lexmark* does not address, let alone alter, the test for standing under 17 U.S.C. § 501(b)."  *DRK (M-H)*, 2014 WL 2584811, at *6.  "*Lexmark's* zone of interest and proximate cause tests [are] inapplicable to the standing issue in this [copyright] case and [the court must] reject Viesti's arguments to the contrary."  *Viesti*, 2015 WL 585806, *8; *see, e.g., Wiley v. DRK Photo*, No. 11-cv-5454, slip op. at 1 (S.D.N.Y. Mar. 5, 2015) (annexed to Penchina Dec as Ex. EE) (*Lexmark* "does not expand the availability of a cause of action under the Copyright Act to owners of a bare right to sue.").

## IV.   CERTAIN OF THE COPYRIGHT REGISTRATIONS RELIED ON BY GHPI ARE INVALID

"The absence of a valid copyright registration . . . bar[s] a plaintiff from bringing a viable copyright infringement action."  *L.A. Printex Indus., Inc. v. Le Chateau, Inc.*, 2012 WL 987590, *3 & n.4 (S.D.N.Y. 2012).  The copyright registrations proffered by GHPI for 37 of its claims are either invalid or do not cover the specific photos that are the subject of those claims.

GHPI's copyright registrations are *not* entitled to any presumption of validity.  As GHPI well knows—and is collaterally estopped from contesting—a "presumption of validity *only applies* to registrations of works 'made *before or within five years after first publication* of the work.'"  *Grant Heilman Photography, Inc. v. McGraw-Hill Cos., Inc.*, 2014 WL 3858186, *4 (E.D. Pa. 2014) (quoting

17 U.S.C. § 410) (emphasis added).  Here, all of the registrations on which GHPI relies were made long beyond five years after publication of the covered works.[7]

### A.    GHPI's Registrations For Grant Heilman's Photos Are Invalid

All of GHPI's registrations for the photos Grant Heilman created as an independent contractor are invalid because GHPI did not own copyright for the photos at the time GHPI registered them in its own name as the purported copyright owner.  For example, GHPI has identified Registration No. VA 1-643-925 as covering the photo created by Mr. Heilman identified in Line 2 of Bruss Ex. 1.  A copy of that registration certificate is included in Ex. D-1 of the Wasco Dec. at 95.  This registration was made by GHPI in its own name as the purported copyright owner for a group of photos titled "1994 Grant Heilman Published Collection."  *Id*.  The registration certificate expressly states that this work is not a work for hire, and it identifies Grant Heilman as the work's author.  GHPI represented to the Copyright Office, and the registration certificate recites, that GHPI owned the copyright and was a proper "Copyright Claimant" because it had been assigned ownership of the copyright by Mr. Heilman.  *Id*. ("Copyright Claimant: Grant Heilman Photography, Inc. . . . Transfer Statement: Transfer by assignment").  This registration was applied for on, and bears the effective registration date of, August 22, 2008.  But, *Mr. Heilman did **not** assign any rights in his photos to GHPI **until June 21, 2011** at the earliest.*  Wasco Dec. Ex. A at 6.  Thus, GHPI's 2008 representation to the Copyright Office that it owned the works via an assignment from the copyright owner *was false*, GHPI

---

[7] For example, GHPI has identified Registration No. VA 1-701-168 as covering the photo identified in line 1 of Bruss Ex. 1.  A copy of that registration certificate is included on page 144 in Ex. D-3 of the Wasco Dec.  The certificate recites that registration was made on February 2, 2010 and gives the "Date of 1st Publication" as "January 13, 1994."  All of the registration certificates submitted by GHPI similarly recite effective dates of registration more than five years after the date of first publication.  Wasco Dec. Ex. D-1 to D-4.  Thus, none of these registrations have a presumption of validity.

was not entitled to claim copyright in its own name, and Registration No. VA 1-643-925 should never have been issued to GHPI.[8]

The same is true for the registrations underlying 34 more of GHPI's claims involving Mr. Heilman's photos—all of which were applied for by and issued in the name of GHPI long before Mr. Heilman assigned any copyrights to GHPI. The invalid registrations are set forth in Ex. CC to the Penchina Declaration. Thus, GHPI's motion for summary judgment should be denied for the following claims listed in Bruss Ex. 1: 2, 4, 6, 7, 9, 11, 14, 15, 18-21, 24, 26, 29, 31, 35-40, 42, 43, 49-54, 64, 67, 68, 69, and 71.

**B.    Some of GHPI's Work For Hire Registrations Are Invalid**

Under the "work for hire" doctrine, when a work is made in the course of a person's employment, "'the employer or other person for whom the work was prepared is considered the author' and owns the copyright." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) (citation omitted). Under the Copyright Act, "a work is 'for hire' under two sets of circumstances: '(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use [for certain purposes] if the parties *expressly agree in a written instrument* signed by them that the work shall be considered a work made for hire.'" *Id*. at 738 (quoting 17 U.S.C. § 101) (emphasis added). Here, GHPI did *not* enter into any written work for hire agreements with any of the photographers. Penchina Dec. Ex. A at 72. So, GHPI could not be the copyright owner under the work for hire doctrine for any photos not created by its commissioned photographers. Rather, GHPI could be deemed copyright owner only for works created by its actual employees during the time that they were employed by GHPI. At least one of GHPI's copyright registrations obtained on a work for hire basis (and covering two of GHPI's claims) is not valid because the photos were created by a photographer *after* he no longer was a GHPI employee.

---

[8] The invalidity GHPI's registrations is not ameliorated by its agency agreement with Mr. Heilman. As discussed above, GHPI obtained no ownership in copyrights under that agreement.

GHPI has identified Registration No. VA 1-706-872 as covering the photos listed in (i) line 5 of Bruss Ex. 1, specifically Image No. I 10 14 14B0, and (ii) line 17 of Bruss Ex. 1, specifically Image No. I 10 14 34C3.  A copy of that registration certificate is included in Ex. D-4 of the Wasco Dec. at page 81.  This registration was made by GHPI in its own name as the purported owner of the copyright in a group of photos titled "1996 Grant Heilman Photography Inc. Published Collection."  *Id*.  The registration certificate expressly states that the covered work was work made for hire and identifies GHPI as author.  At her deposition, Sonia Wasco testified that Image Nos. I 10 14 14B0 and I 10 14 34C3 were created by Arthur Smith.  Penchina Dec. Ex. A at 103-04 (identifying authors of images shown in Ex. B).  And, GHPI's submission to the Copyright Office indicated that the "Year of Creation" of these photos was **1995**.  Wasco Dec. Ex. D-4 at 95-96.  However, Mr. Smith's employment by GHPI ended in 1993.  On February 12, 1993, GHPI responded to a governmental "Income Execution" demand seeking to garnish Mr. Smith's wages by filling out the section of the government form applicable "if the above named person [Arthur C. Smith III] is no longer in your employ."  Penchina Dec. Ex. Z.  GHPI reported that Smith's "Employment Terminated: 1/4/93.  *Id*.; *see id*. Ex. A at 93 ("Q. Is it your understanding that Mr. Smith's employment with the company was terminated in January of '93? A. Yes.").  Thus, GHPI's representation to the Copyright Office that it was author and copyright owner of Image Nos. I 10 14 14B0 and I 10 14 34C3 as works for hire *was false*, GHPI was not entitled to claim copyright in its own name, and Registration No. VA 1-706-872 is invalid, at least with respect to Mr. Smith's photos identified in lines 5 and 17 of Bruss Ex. 1.

## V.     WILEY DID NOT EXCEED THE SCOPE OF CERTAIN PLEADED LICENSES

GHPI's submissions overstate Wiley's printing of certain books at issue.  But GHPI misapprehends the documents which it cites as evidence.  GHPI contends that Wiley printed 21,777 copies of *Raster Modeling* by Demers, first edition, in violation of its license to print 10,000 copies.  Bruss Ex. 1, lines 29, 30.  But, Wiley printed just 4,380 copies of this book.  Bruss Dec. Ex. 2 at 1 (listing for Demers, ISBN 0471319651).  GHPI incorrectly added  the print runs for other books by

Demers which are in the same product family but which do not contain GHPI's photos.  GHPI

accordingly would not be entitled to summary judgment on these claims even if it could overcome all

of its other failings in its case.

## <u>CONCLUSION</u>

For all of the foregoing reasons, GHPI's motion for summary judgment should be denied in its

entirety.

Dated: April 3, 2015    Respectfully submitted,

          LEVINE SULLIVAN KOCH & SCHULZ, LLP

          By:  *s/ Robert Penchina*
          Robert Penchina
          Levine Sullivan Koch & Schulz, LLP
          321 West 44th Street, Suite 1000
          New York, NY 10036
          212-850-6109

          Joseph J. Barker
          JOHN WILEY & SONS, INC.
          111 River Street
          Hoboken, NJ 07030
          *Attorneys for John Wiley & Sons, Inc.*